IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

|  |  |
|---|---|
| K-TEC, INC., <br><br> Plaintiff, <br><br> vs. <br><br> VITA-MIX CORPORATION, <br><br> Defendant. | ORDER <br><br> AND <br><br> MEMORANDUM DECISION <br><br> Case No. 2:06-CV-108-TC |

Defendant Vita-Mix Corporation moves the court for summary judgment on the ground that K-TEC is not entitled to lost profits, pre-issuance royalties, or enhanced damages for willful infringement. Viewing the evidence, and making reasonable inferences therefrom, in a light most favorable to non-movant K-TEC, the court finds that genuine issues of material fact exist on all three issues. Accordingly, Vita-Mix's Motion for Summary Judgment of Lost Profit, Pre-Issuance Royalties and Enhanced Damages (Docket No. 473) is DENIED.[1]

---

[1] Vita-Mix also filed a Motion to Strike certain evidence relied upon by K-TEC. (See Docket No. 541.) Because the court finds that other unchallenged evidence in the record is sufficient to overcome Vita-Mix's motion for summary judgment, Vita-Mix's Motion to Strike is moot. Moreover, to the extent the court relies on evidence that has been challenged, the court finds that such evidence is admissible for the same reasons stated in K-TEC's opposition to the motion to strike.

# ANALYSIS[2]

A.  **Summary Judgment Standard**

Summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Justice v. Crown Cork & Seal Co., Inc., 527 F.3d 1080, 1085 (10th Cir. 2008). "An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant." Jenkins v. Wood, 81 F.3d 988, 990 (10th Cir. 1996). When applying this standard, the court must construe all facts and reasonable inferences from those facts in a light most favorable to K-TEC, the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Seegmiller v. LaVerkin City, 528 F.3d 762, 766 (10th Cir. 2008).

The party seeking summary judgment bears the initial burden of demonstrating that there is an absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). But if the non-moving party comes forward with admissible evidence that a reasonable jury could find for the non-moving party on the issue, summary judgment is not appropriate. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

B.  **Damages for Patent Infringement**

Under the damages provision of federal patent law, upon a finding of infringement the

---

[2]The parties have set forth the facts in great detail in the pleadings, so the court will not repeat them here unless they are essential to the decision. Because the court is reviewing the matter in the context of a motion for summary judgment, the court construes the facts in a light most favorable to non-movant K-TEC. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Seegmiller v. LaVerkin City, 528 F.3d 762, 766 (10th Cir. 2008).

court "shall award [the patent owner] damages adequate to compensate for the infringement but in no event less than a reasonable royalty for the use made of the invention by the infringer[.]" 35 U.S.C. § 284 (2010).  The phrase "damages adequate to compensate" includes lost profits, pre-issuance royalties, and enhanced damages for willful infringement.  See 35 U.S.C. § 154(d) (pre-issuance royalties), § 284 (allowing enhanced damages up to three times the amount assessed); Grain Processing Corp. v. American Maize-Products Co., 185 F.3d 1341, 1349 (Fed. Cir. 1999) (lost profits).

### 1. Lost Profits

K-TEC must prove that it is entitled to lost profits based on an objective standard of "reasonable probability":

> [A] patentee need not negative every possibility that the purchaser might not have bought another product other than his absent the infringement.  Instead, the patentee need only show that there was a reasonable probability that the sales would have been made "but for" the infringement. . . . Any doubts regarding the calculatory precision of the damage amount must be resolved against the infringer. . . . [Federal Circuit cases] represent the pervading principle that doubt in ascertaining appropriate damages comes down against the infringer . . . . Therefore, when the patentee establishes the reasonableness of the inference, the patentee has sustained the burden of proving his entitlement to lost profits for all infringing sales.  The onus is then placed on the infringer to show that it is unreasonable to infer that some or all of the infringing sales probably caused the patentee to suffer the lost profits.

Kaufman Co., Inc. v. Lantech, Inc., 926 F.2d 1136, 1141-42 (Fed. Cir. 1991).  The question of lost profits is a jury question.  See, e.g., Utah Med. Prods., Inc. v. Graphic Controls Corp., 350 F.3d 1376, 1385 (Fed. Cir. 2003) (affirming jury's identification of relevant market under two-supplier market test); Micro Chemical, Inc. v. Lextron, Inc., 318 F.3d 1119, 1123-24 (Fed. Cir. 2003) (holding that issue should have gone to jury because there was genuine issue of material

fact concerning Panduit product demand factor).

Two tests (the two-supplier market test and the Panduit test) have been established to determine whether a patent holder is entitled to lost profits. The two-supplier market test was created before the Federal Circuit was established. See, e.g., Livesay Window Co., Inc. v. Livesay Indus., Inc., 251 F.2d 469, 471 (5th Cir. 1958). Since then, the Federal Circuit has reconciled the two tests by indicating that "the two-supplier market test collapses the first two Panduit factors into one 'two suppliers in the relevant market' factor." Micro Chemical, 318 F.3d at 1124. The court will address each in turn.

      a.      Two-Supplier Market Test

The first step when applying the two-supplier test is to determine the relevant market. "This requires an analysis which excludes alternatives to the patented product with disparately different prices or significantly different characteristics." Crystal Semiconductor Corp. v. TriTech Micro-Elecs. Int'l, Inc., 246 F.3d 1336, 1356 (Fed. Cir. 2001).

> The proper starting point to identify the relevant market is the patented invention. The relevant market also includes other devices or substitutes similar in physical and functional characteristics to the patented invention. It excludes, however, alternatives "with disparately different prices or significantly different characteristics."

Micro Chemical, 318 F.3d at 1124 (quoting Crystal Semiconductor, 245 F.3d at 1356)). Once the market is defined, the next step is to determine how many suppliers operate in that relevant market. Id.

In this case, the market is defined by substantially higher prices and blending products that perform at an entirely new "high performance" level. According to each party's damage expert, the average price for K-TEC's five-sided jar is $68.07, while the average price for the

4

unpatented four-sided jar is $39.44, a difference of $28.63 per jar. (Expert Report of Kevin Neels (attached as Ex. 10 to Decl. of David T. Movius, Esq.) [hereinafter "Neels Report"] at Ex. 15; Rebuttal Expert Report of Lance E. Gunderson, Sched. 14.) The price of the patented K-TEC five-sided jar is 42% higher than the unpatented four-sided jar. Dr. Neels also compared the price between the accused Vita-Mix jar and the non-accused Vita-Mix jar. The average price for the accused jar ranged from $27.50 to $29.03, whereas the price for the unpatented jar ranged from $22.50 to $23.75 for a difference of between $5.00 and $5.28. (Neels Report Ex. 16.) The price for the accused Vita-Mix jar is 18.2% higher than the non-accused jar. The patented product and the accused product are priced notably higher than other unpatented products.

There is a reason for the high price: K-TEC's patented technology embodied in both the K-TEC patented jar and the Vita-Mix jars performs at a much higher level than anything else in the market. Indeed, the invention claimed in both of the patents is a high performance blending container. ('117 Patent, Col. 2 lines 54-67.) During prosecution of the '117 patent, Richard Galbraith (K-TEC's Executive Vice President) presented a declaration showing that the five-sided jar blended a difficult-to-blend smoothie in fourteen seconds, as opposed to K-TEC's own prior art four-sided jar, which blended it in forty-two seconds. (Decl. of Dick Galbraith (Ex. X to Docket No. 478) at ¶¶ 4-10. See also internal Vita-Mix e-mail (Jan. 12, 2003) (stating that K-TEC's new blending jar was "the most serious threat we have had in the [Baskin Robbins] account in several years.") (Ex. 19 to K-TEC Mem. Opp'n); internal Vita-Mix e-mail (Dec. 12, 2002) (articulating Baskin Robbins' demand for Vita-Mix's new jar) (Ex. 18 to K-TEC Mem. Opp'n); internal Vita-Mix e-mail (May 10, 2002) ("Blendtec is giving Caribou [Coffee] 40 machines to test in the field. The only way we can stop them from changing is to let the

customer see the performance of our container. If we compare, we have a good shot at keeping the business. If we don't compare, we will lose it. I am sure this is just the start. I'm sure Blendtec is going to every account and showing them this container, which blows ours away.") (Ex 24 to K-TEC Mem. Opp'n). And Vita-Mix's own test showed that Vita-Mix's prior art 64-ounce jar blended two drinks in thirty seconds (with three or more drinks impossible), compared to K-TEC's five-sided jar, which blended four drinks in fifteen seconds. (May 10, 2002 e-mail from D. Scott Hinckley (Vita-Mix) to David Barnard et al. (Ex. 24 to K-TEC's Mem. Opp'n).)

Here, there is evidence to convince a reasonable jury that the four-sided jars, as well as commercial blenders made by Waring and Hamilton Beach, should be excluded as alternatives based on price difference and blending performance. See, e.g., Crystal Semiconductor, 246 F.3d at 1354-56 (reinstating jury's lost profits verdict based upon evidence that there were two suppliers in the "high quality market" for computer audio chips). In other words, K-TEC has presented evidence sufficient to convince a reasonable jury that the relevant market is the high performance blending market.

The final question in the two-supplier market test is "how many suppliers operate in the defined relevant market?" Micro Chemical, 318 F.3d at 1125. Here, there is evidence that only K-TEC and Vita-Mix compete in the high performance blending market.

For example, K-TEC has provided the testimony of a third-party retailer, Bintz Restaurant Supply, represented by Roger Brown. (See 30(b)(6) Dep. of Bintz Restaurant Supply (Ex. 8 to K-TEC Mem. Opp'n) at 50-52.) Bintz buys and resells the products of both K-TEC and Vita-Mix, and considers each to be "very good" vendors for Bintz. Roger Brown testified that there are only two viable competitors in the high performance commercial blending industry. He said,

"If I was getting [a blender] for commercial use, I would either get the Vita-Mix or [K-TEC's] Blendtec, probably. I believe that they're more powerful. We've had customers that have bought less powerful blenders and they don't work well for them." (Id. at 52.) See also Golden Blount, Inc. v. Robert H. Peterson Co., 438 F.3d 1354, 1370 (Fed. Cir. 2006) (affirming district court decision that lost profits award was appropriate because there was two-supplier market; in reaching conclusion, district court relied on testimony of third-party retailer). In Golden Blount, based on the testimony of the third-party retailer, the Federal Circuit found that "[a]lthough this evidence was not irrefutable, it was sufficient to shift the burden" to the alleged infringer. Id. at 1372. (See also Rule 30(b)(6) Dep. of George Wright (Ex.5 to K-TEC Mem. Opp'n) at 43-45, 92); Dep. of G. Wright (Ex. 6 to K-TEC Mem. Opp'n) at 156; Vita-Mix Strategic Plan for 2009 (Ex. 9 to K-TEC Mem. Opp'n) at V017819 (under "Competitive Landscape" heading, noting "[p]ossible creation of new category of 'high performance blenders' and that "category is becoming more popular."); Dep. of Lance E. Gunderson (Ex. 2 to K-TEC Mem. Opp'n) at 295 (opining that "two supplier market" consists of Vita-Mix and K-TEC).)

Based on the foregoing, the court finds that K-TEC has provided evidence of a reasonable probability that "but for" Vita-Mix's sales of the accused products, K-TEC would have made the sales that were made by Vita-Mix. In other words, K-TEC has satisfied its burden under the summary judgment standard and is entitled to present its lost profits damage theory under the two-supplier market test to the jury.

  b. The *Panduit* Test

Alternatively, K-TEC is entitled to present the issue of lost profits to the jury based on the Panduit test. Under Panduit, a patentee may obtain lost profits by showing: (l) demand for the

patented product, (2) the absence of acceptable non-infringing substitutes, (3) manufacturing and marketing capability to exploit the demand, and (4) the amount of profit that would have been made. Panduit Corp. v. Stalin Bros. Fibre Works, Inc., 575 F.2d 1152, 1156 (6th Cir. 1978).

Vita-Mix only challenges the factual record supporting the first two Panduit elements: (1) demand, and (2) absence of an acceptable non-infringing substitute.

                i.       Demand for the Patented Product

As a threshold issue, the court addresses Vita-Mix's contention that the first Panduit factor requires demand for the specific feature (i.e., claim limitation) that distinguishes the patented product from non-patented features, not simply demand for the patented product. But the Federal Circuit has rejected such an argument. See DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc., 576 F.3d 1314, 1329-30 (Fed. Cir. 2009) (finding that first Panduit factor "does not require any allocation of consumer demand among various limitations recited in a patent claim," but "simply asks whether demand existed for the 'patented product, i.e., a product that is covered by the patent suit' or that 'directly competes with the infringing device.'").

Demand for the patented product can be established by sales of the patented product. DePuy Spine, 567 F.3d at 1330 (quoting Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1548-49 (Fed. Cir. 1995) (en banc)). K-TEC has sold more than $10 million of the five-sided jar blending systems. (Sched. 10G of Jan. 15, 2010 Expert Report of Lance E. Gunderson (Ex. 7 to Vita-Mix's Mem. Supp.).) Demand for the patented product is also shown by demand for a product that "directly competes with the infringing device." DePuy Spine, 567 F.3d at 1330. Vita-Mix has sold almost $50 million worth of accused jar blending systems, of which $37 million in sales occurred after issuance of the '117 patent. (Sched. 6G of Jan. 15, 2010 Gunderson Report.)

These significant sales alone establish demand for the patented product. See BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc., 1 F.3d 1214, 1218-19 (Fed. Cir. 1993) ("evidence of sales of the infringing product may suffice to show Panduit's first factor").

Beyond sales of the patented and accused products, there is other evidence showing demand for the patented product. (See, e.g., Dep. of Scott Hinckley (Vita-Mix Director of Sales & Marketing) at 45-47, 112, 136-37, 141-42, 145-46; Dep. of Richard Galbraith (K-TEC Exec. V.P.) at 86-89, 95-97; Dep. of David Kolar (Sr. Engineer for Product Development at Vita-Mix) at 101; Dep. of David Barnard (former Vita-Mix Director of Engineering) at 44, 46; Dep. of Jonathan Katz (former Vita-Mix Director of Engineering) at 94-95.)

Vita-Mix claims there is no evidence that the five-sided jar configuration "actually improves blender performance." (Vita-Mix Mem. Supp. Mot. Summ. J. at 4.) Contrary to Vita-Mix's claim, the record contains evidence establishing that the jar configuration does improve blender performance.

For example, the patent establishes that the claimed invention improves blending performance. And Richard Galbraith testified that his test of the difference between the K-TEC four-sided jar (unpatented) and the patented five-sided jar showed a dramatic difference that impressed customers. (Galbraith Dep. at 86-88.) Vita-Mix's internal documents suggest that when Baskin-Robbins received the five-sided jar and began testing it, "they loved the equipment." (Internal Vita-Mix E-mail (Dec. 12, 2002) (Ex. 18 to K-TEC Mem. Opp'n).) Another Vita-Mix customer, Ruby Tuesday/Coke, reported that K-TEC's "Blendtec Easy Blend beat the s*#t out of the Vita-Mix." (Internal Vita-Mix e-mail (Jan. 30, 2003) (Ex. 26 to K-TEC Mem. Opp'n).) Caribou Coffee reported that K-TEC's five-sided jar significantly out-performed

9

Vita-Mix's prior art jar. (Internal Vita-Mix E-mail (May 10, 2002) (Ex. 24 to K-TEC Mem. Opp'n).) And Tropical Smoothie reported that the K-TEC five-sided jar "blends much faster." (Internal Vita-Mix E-mail (Nov. 21, 2002) (Ex. 25 to K-TEC Mem. Opp'n).) Furthermore, Scott Hinckley, Vita-Mix's Director of Sales and Marketing, reported Vita-Mix's own testing showing that the K-TEC five-sided jar "blows ours away," and that if Vita-Mix did not come up with a comparable product, it would lose every customer account. (Internal Vita-Mix E-Mail (May 10, 2002) (Ex. 24 to K-TEC Mem. Opp'n). See also May 16, 2003 Vita-Mix Press Release (Ex. 13 to K-TEC Mem. Opp'n) (in which Scott Hinckley attributed the solution to the cavitation problem to be the MP container).)

In sum, the above evidence of demand for the patented product (both the sales and its higher blending performance) is sufficient to overcome the motion for summary judgment.

ii. The Absence of Acceptable Non-Infringing Substitutes

The Federal Circuit recently articulated the "acceptable noninfringing substitutes" analysis in Cohesive Technologies, Inc. v. Waters Corporation, 543 F.3d 1351 (Fed. Cir. 2008):

> The mere existence of a competing device does not necessarily make that device an acceptable substitute. A product on the market which lacks the advantages of the patented product can hardly be termed a substitute acceptable to the customer who wants those advantages. Accordingly, if purchasers are motivated to purchase because of particular features available only from the patented product, products without such features - even if otherwise competing in the marketplace - would not be acceptable noninfringing substitutes.
>
> Thus, to prove that there are no acceptable noninfringing substitutes, the patent owner must show either that (1) the purchasers in the marketplace generally were willing to buy the patented product for its advantages, or (2) the specific purchasers of the infringing product purchased on that basis.

Id. at 1373 (internal citation omitted). "To be deemed *acceptable*, the alleged acceptable

noninfringing substitute must not have a disparately higher price than or possess characteristics significantly different from the patented product." Kaufman Co., Inc. v. Lantech, Inc., 926 F.2d 1136, 1142 (Fed. Cir. 1991).

When a defendant does not actually have a non-infringing substitute on the market during the relevant accounting period, the defendant bears "the burden of overcoming the inference of unavailability." DePuy Spine, 567 F.3d at 1331; see also Grain Processing, 185 F.3d at 1353 ("When an alleged alternative is not on the market during the accounting period, a trial court may reasonably infer that it was not available as a non-infringing substitute at that time."). And where there is evidence of a defendant's "unsuccessful attempt to develop a noninfringing" design, a reasonable jury could conclude that a non-infringing design would not have been available or acceptable. DePuy Spine, 567 F.3d at 1332.

Here, a reasonable jury could conclude there was an absence of acceptable non-infringing substitutes during the relevant infringement period on the basis that Vita-Mix did not have a non-infringing substitute on the market during the relevant accounting period. It is undisputed that Vita-Mix's initial response to K-TEC's five-sided jar in the marketplace was the development of the MP container, which the court has found is a direct copy of K-TEC's patented jar. Vita-Mix then created the XP container, which embodied an "invisible," "cosmetic" change that was "equal in performance" to the accused MP container.

Furthermore, the court finds that a reasonable jury could conclude that Vita-Mix's recent "Advanced Container" is not an acceptable non-infringing substitute. Vita-Mix's apparent inability to develop an acceptable non-infringing substitute over an extended period of time shifts the burden of overcoming the inference of unavailability to Vita-Mix. Id. at 1331.

11

This is not a case where Vita-Mix was surprised by a new product that addressed an unknown need. When Scott Hinckley began working for Vita-Mix in 1991, he asked for a blending jar that would avoid the cavitation problem. Vita-Mix's team of engineers worked hard to resolve the issue, but was unsuccessful. The only jars that did prevent cavitation were the accused jars. The length of time when Vita-Mix was aware of the long-standing industry-wide problem, the need for high performance commercial blending jars that did not cavitate, and an inability to produce one for a period of approximately nineteen years (from when Hinckley started in 1991 to the present) all create an inference of unavailability and the burden shifts to Vita-Mix to overcome that inference of unavailability.

The record also shows that Vita-Mix put a great deal of effort into designing around K-TEC's patent. When issuance of the '117 patent was imminent, Vita-Mix created fourteen different design-around containers, as well as the XP container. The design around options were of all different configuration geometries, which looked nothing like K-TEC's five-sided jar. However, some jars did not blend well and many of the jars cavitated. Only one was equal in performance: the XP container which embodied an "invisible" or "cosmetic" change from the MP container.

Vita-Mix's contention that Waring and Hamilton Beach are competitors in the general commercial market is not persuasive because it is not supported by any evidence that Hamilton Beach or Waring actually produced or sold competitively priced products that performed at the level of the patented jar and the accused product.

And the court is not persuaded by Dr. Neels' conclusion that the Miller patent is evidence of an acceptable non-infringing substitute. (See Neels Report at 10.) None of the blending jars

disclosed in Miller, including Figure 4, was ever commercialized because either it did not work or there was no market for it. (E.g., Hinckley Dep. at 82-88; Katz Dep. at 58-60.)

For all of the reasons set forth above, the court declines to grant summary judgment based on the Panduit factors.

### 2. Pre-Issuance Royalties

K-TEC alleges that certain Vita-Mix blending jars infringe the claims of '117 and '842 patents. Although the '117 patent issued on December 27, 2005, K-TEC contends that that was not the first time Vita-Mix became aware that K-TEC was seeking patent rights for a blending jar.

The application that led to the '117 patent was filed on September 23, 2004 ("the '682 application"), and later published on February 17, 2005 as U.S. Pub. No. 2005/0036401 ("the '401 publication"). The application that led to the '842 patent was filed on December 26, 2005 ("the '830 application"), and later published on August 3, 2006, as U.S. Pub. No. 2006/0171249 ("the '249 publication").

K-TEC seeks to recover a reasonable royalty for Vita-Mix's manufacture, use, sale, and offer to sell of blending jars that infringe the invention claimed in the '401 and '249 publications, from the time Vita-Mix was given notice of these publications until issuance of their corresponding patents. See 35 U.S.C. § 154(d)(1). Such damages are referred to as pre-issuance royalties, or "provisional rights."

To establish entitlement to pre-issuance royalties (also known as provisional rights), K-TEC must show essentially two things.

K-TEC must first establish that Vita-Mix had actual notice of the application for the

13

patent. 35 U.S.C. § 154(d)(1)(B) (a valid patent includes "the right to obtain a reasonable royalty from any person who, during the period beginning on the date of publication of the application for such patent under section 122(b) . . . and ending on the date the patent is issued . . . had <u>actual notice of the published patent application</u> . . . ." (emphasis added). Actual notice is a question of fact for the jury. <u>Loops, LLC v. Americare Prods., Inc.</u>, 636 F. Supp. 2d 1128, 1133 (W.D. Wash. 2008).

Then, K-TEC must show that the claims of the patent application are substantially identical to those in the patent. 35 U.S.C. § 154(d)(2) (providing that pre-issuance royalties are available only if "the invention as claimed in the patent is <u>substantially identical</u> to the invention as claimed in the published patent application.") (emphasis added).

Vita-Mix contends that K-TEC is not entitled to provisional rights because (1) K-TEC did not specifically plead a "provisional rights" damages theory; (2) K-TEC did not provide actual notice to Vita-Mix of the '401 published patent application before the '117 patent was issued; (3) the claims of the '401 published application are not substantially identical to the claims of the '117 patent; and (4) K-TEC has no evidence of the amount of pre-issuance royalty damages it claims to have suffered. The court disagrees.

First, K-TEC's Amended Complaint prays for relief for specifically identified damages as well as "such other and further relief as the Court may deem just and proper." (Am. Compl. Prayer For Relief ¶ g.) K-TEC's pleading satisfies the notice pleading requirements of Rule 8. <u>See also</u> <u>Classen Immunotherapies, Inc. v. King Pharm., Inc.</u>, 403 F. Supp. 2d 451, 457 (D. Md. 2005) ("Section 154(d) . . . expands the scope of patent infringement rather than creating a new cause of action. . . . [A] claim for infringement includes the right to obtain" pre-issuance

14

royalties). Moreover, the fact that K-TEC is seeking pre-issuance royalties has been known to the parties for some time. Indeed, the existence and timing of Vita-Mix's purported knowledge of the '401 Publication has been a source of contentious discovery. (See, e.g., Pl.'s Mem. Supp. Mot. Compel Production (Docket No. 400) at 3-4, 14.) Accordingly, Vita-Mix's pleading argument is not well taken.

Second, Vita-Mix unpersuasively attempts to place a narrow construction on the statutory term "actual notice" by contending that it must take the form of a direct notification from K-TEC to Vita-Mix. Although written notice is certainly sufficient to satisfy the statutory requirement, the court does not read the statute's plain language to be so limited. See, e.g., Arendi Holding Ltd. v. Microsoft Corp., Slip Copy, Civ. No. 09-119-JJF-LPS, 2010 WL 1050177 at *7 (D. Del. Mar. 22, 2010) (holding that the term "actual notice" in § 154(d) did not require "that the patent applicant take an affirmative act to provide such notice to the alleged infringer (if the applicant can prove that the alleged infringer came to have actual notice through some other means).").

Evidence shows that Vita-Mix monitored the application which matured to the '117 Patent. (See, e.g., Dec. 9, 2005 e-mail from John Hoffa to Ray Seuffert (attached as Ex. 29 to Pl.'s Mem. Opp'n) (stating that "the patent that impacts our 'old style' MP container should be official either the 20th or 27th of this month.").) A reasonable jury could find that Vita-Mix was actually aware of the '401 publication at some point before the '117 Patent was issued. The question is when did Vita-Mix have actual notice of K-TEC's patent application? K-TEC has created a genuine issue of material fact concerning whether and when Vita-Mix had actual notice of the published patent application.

Third, evidence in the record supports the conclusion that the invention claimed in the

'401 publication is substantially identical to the invention claimed in the '117 Patent. While narrowing amendments can preclude a finding that the claims are not "substantially similar," "there is no per se rule that an amendment to a claim in order to overcome a PTO rejection based on prior art precludes finding valid provisional rights." Pandora Jewelry, LLC v. Chamilia, LLC, 2008 WL 3307156 at *10 (D. Md. 2008). Indeed, if the substance of the claims stay the same, they are "identical." See Tennant Co. v. Hako Minuteman, Inc., 878 F.2d 1413, 1417 (Fed. Cir. 1989) (finding that where claims amendments simply make the claim more definite, they are without substantive change).

Claim 20 as it appears in the '401 publication was amended two times before becoming allowed Claim 1 of the '117 Patent. The first amendment, which added "a movable blending member" to Claim 20, was submitted by supplemental preliminary amendment, not in response to any action from the United States Patent and Trademark Office ("PTO"). The second amendment was submitted after receiving a rejection from the PTO. Although the concept of corners being formed by the four side walls was already present in the claim, the amendment provided that the four side walls form "intersecting corners." This amendment clarifies what was in the claim already–that corners are formed by the intersection of the side walls. See Tennant Co., 878 F.2d at 1417 (finding that "[b]ecause a second cannot exist without a first, common sense dictates that the claimed first wall section is also a bottom wall section" in holding that reexamination claim was "identical" to original claim).

And, finally, despite Vita-Mix's claim, K-TEC has provided sufficient financial evidence to establish that it may be entitled to pre-issuance royalties. (See Gunderson Expert Reports.)

For all the foregoing reasons, the court denies Vita-Mix's motion for summary judgment

16

concerning pre-issuance royalties.

### 3. Enhanced Damages For Willful Infringement

Whether a defendant's infringement was willful is a question of fact for the jury. i4i Ltd. Part. v. Microsoft Corp., 598 F.3d 831, 858-59 (Fed. Cir. 2010); ACCO Brands, Inc. v. ABA Locks Mfr. Co., Ltd., 501 F.3d 1307, 1311 (Fed. Cir. 2007). K-TEC has presented evidence from which a reasonable jury could find that Vita-Mix willfully infringed K-TEC's patents. Accordingly, Vita-Mix is not entitled to summary judgment on the issue of enhanced damages.

### **ORDER**

For the reasons set forth above,

1. Vita-Mix Corporation's Motion to Strike (Docket No. 541) is DENIED AS MOOT.

2. Vita-Mix Corporation's Motion for Summary Judgment of No Lost Profits, Pre-Issuance Royalties and Enhanced Damages (Docket No. 473) is DENIED.

SO ORDERED this 24th day of May, 2010.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
Chief Judge